IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2009

## STATE OF TENNESSEE v. TRAVIS TIERNEY

**Appeal from the Circuit Court for Madison County**
**No. 08-91     Donald H. Allen, Judge**

---

### No. W2008-02285-CCA-R3-CD  - Filed October 2, 2009

---

The Defendant, Travis Tierney, was charged with one count of second degree murder, a Class A felony, two counts of aggravated assault, a Class C felony, and one count of tampering with evidence, a Class C felony. <u>See</u> Tenn. Code Ann. §§ 39-13-210(c), -102(d)(1), -16-503(b). He was found guilty as charged following a jury trial and sentenced to concurrent sentences of twenty-five years for second degree murder, six years for each aggravated assault, and six years for tampering with evidence, for a total effective sentence of twenty-five years in the Department of Correction. In this direct appeal, he contends that: (1) the State presented evidence insufficient to convict him of second degree murder; and (2) the trial court erred in sentencing him to the maximum sentence of twenty-five years for second degree murder. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Gregory Gookin, Jackson, Tennessee, for the appellant, Travis Tierney.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Jerry Woodall, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The events underlying this case began on January 19, 2007. Vicki Shumate, a friend of the Defendant and his co-defendant, Colby Garner, testified that on that evening, she drove the two men to a bar. She later returned to the bar to pick them up. The three returned to Ms. Shumate's house in Jackson. The Defendant and Garner then watched television in the living room. As Ms. Shumate prepared to go to sleep early in the morning of January 20, she heard the Defendant receive a number

of calls from Alisha Crisp, the Defendant's ex-girlfriend. The Defendant then told Ms. Shumate that he and Garner planned to go to a party and that they believed there would be cocaine at the party. The Defendant had a pocket knife in his hand and told Ms. Shumate that he "wasn't leaving [the party] without any" cocaine and that he would kill someone to get it if necessary. Ms. Shumate noted, however, that the Defendant had been holding the pocket knife for much of the night and did not remove it from his pocket specifically for the purpose of making this threat. Someone arrived at Ms. Shumate's house to drive the Defendant and Garner to the party.

The party took place at the home of Jeremy Jones in Jackson. The Defendant and Garner arrived at the party, after being driven by Christy Coleman, between 5:00 and 6:00 a.m. on the morning of January 20, 2007. A number of party attendees testified at trial about that morning's events, including Bryan Jones, Jeremy Jones and Rita Armstrong.

In the light most favorable to the State, the evidence established that the Defendant and Garner conversed with other party attendees without incident for about thirty minutes after their arrival. The Defendant then engaged in an argument with his ex-girlfriend, Ms. Crisp, who was also present. Another attendee, homicide victim Keith Hartley, tried to mediate their dispute. Ms. Armstrong eventually pulled Mr. Hartley away from the conflict and into the bathroom. She suggested that the two of them should leave. As they stood in the bathroom, they heard someone bang on the door. Ms. Armstrong opened the door and saw the Defendant, who said, "Give me whatever you guys are doing in there." The Defendant then demanded cocaine.

Ms. Armstrong responded that she did not have any cocaine, although she noted at trial that she and some of the other attendees had used cocaine at a bar earlier that morning. She then stepped out of the bathroom into the hallway. The living room was at one end of the hallway and the bedrooms were at the other. The Defendant blocked Ms. Armstrong from walking toward the living room, so she turned around and walked toward the bedroom. Mr. Hartley followed her. The Defendant, followed by Garner, told Ms. Armstrong, "If you don't give me what you've got, I'm going to fuck up your boy." Mr. Hartley asked, "Are you talking about me?"

This exchange caught Jeremy Jones' attention. He observed that the Defendant and Garner had cornered Ms. Armstrong and Mr. Hartley in the hall and also observed that the Defendant had his hand in his pocket. This led Jeremy Jones to believe the Defendant had a knife. He told another attendee, Michael Grove, to get a knife and come help; Mr. Grove responded, "I'm not getting in the middle of that." Jeremy Jones went to the kitchen and retrieved a butcher knife. He also took out a pocket knife.

He returned to the hall with the two knives and apparently tried to position himself between the Defendant and Garner at the living room end of the hall and Ms. Armstrong and Mr. Hartley near the bedrooms. The Defendant, now holding a knife in his hand, turned to Jeremy Jones and threatened him with the knife. Jeremy Jones slashed at the Defendant's neck, causing a superficial cut. The Defendant retreated into the living room, put his knife in his pocket, and threw a chair at

Jeremy Jones. Jeremy Jones threw the chair back at the Defendant and sank to the floor, the impact of the chair having injured his leg.

Mr. Hartley pushed Ms. Armstrong into a nearby bedroom and told her to close and lock the door. She did so. The Defendant and Garner then turned their attention away from Jeremy Jones, pushing Mr. Hartley into an adjacent utility room. After a few moments of fighting, the Defendant and Garner emerged from the utility room. The Defendant was covered in blood and held a bloody knife in his hand. Mr. Hartley, also covered in blood, emerged from the utility room and, after stumbling down the hallway, collapsed in the living room.

Ms. Armstrong heard someone say that Mr. Hartley had been stabbed. She exited the bedroom and saw Mr. Hartley "gushing blood everywhere." She also saw the Defendant standing in the utility room doorway asking, "Come on, who wants some more?" Ms. Armstrong joined Jeremy Jones in trying to stop Mr. Hartley's bleeding.

The Defendant and Garner left the house via its carport door, encountering Bryan Jones outside. Bryan Jones had left the house to call the police after seeing the Defendant throw the chair at Jeremy Jones. The Defendant, still holding his bloody knife, approached Bryan Jones, threatened to cut him, and demanded a ride away from the house. Garner did not appear to have blood on him. Bryan Jones tried to placate the Defendant and Garner by agreeing to drive them away, but pointed out that his car was blocked in by another vehicle. The Defendant ran back into the house. Bryan Jones called the police a second time.

Returning to the living room, the Defendant pushed the top half of a bookshelf toward Ms. Armstrong and Jeremy Jones, who continued to tend to Mr. Hartley. They had been joined by Mr. Grove and another attendee, Andy O'Neal. The bookshelf did not hit anyone. The Defendant also threw a nearby floor lamp at them but missed. He then left the house. Mr. Hartley died shortly after an ambulance arrived a few minutes later. At some point, Jeremy Jones put his butcher knife back in a kitchen drawer; he told police it was there, however.

Billy Bright, an acquaintance of the Defendant, testified that he got in his truck between 3:30-45 p.m. on January 20, 2007, having just finished work. After starting his truck, he was surprised to discover the Defendant hiding in the back of the truck. Mr. Bright observed that the Defendant had blood on his clothes and a cut on his neck. Without invitation, the Defendant opened Mr. Bright's passenger side door and got into the truck. The Defendant told Mr. Bright that he had been in a "confrontation" and admitted that police were looking for him. Mr. Bright, himself on probation, told the Defendant to get out of his truck. The Defendant did so, and Mr. Bright did not see him again.

Angela Ross, another acquaintance of the Defendant, testified that the Defendant came to her house later that day. He had blood on his clothes and said he had been in a fight. Ms. Ross' boyfriend gave the Defendant a change of clothes. Ms. Ross did not know what the Defendant did with the bloody clothes; he only stayed at her house for a minute. Mike Holt, an investigator with

the Jackson Police Department, testified that he and his unit searched a number of areas for the Defendant's bloody clothes and knife but were unable to recover them.

Dr. Feng Li, an assistant medical examiner, performed Mr. Hartley's autopsy. He testified that Mr. Hartley was stabbed in the middle of his chest, on the left side of his chest, and in both arms. The chest wounds punctured his heart, aorta, and left lung. The resulting blood loss would have caused death in a matter of minutes, although Dr. Li could not say exactly how many minutes. Mr. Hartley also had multiple cuts on his hands. Dr. Li testified that those cuts were consistent with wounds one might sustain while in a defensive posture. Dr. Li classified Mr. Hartley's cause of death as "multiple stab wounds" and his manner of death as "homicide."

Garner surrendered himself to police at 2:30 p.m. on January 20, 2007; the Defendant surrendered himself at 1:30 a.m. on January 21, 2007. The Defendant's clothes were inventoried and a spot of blood was detected on his underwear. His underwear, along with his shoes and a DNA sample, were sent to the Tennessee Bureau of Investigation (TBI) for DNA comparison with blood located at the crime scene. TBI serologist Charles Hardy testified that the Defendant's underwear and shoes contained blood matching Mr. Hartley's DNA.

The Defendant was convicted of one count of second degree murder, two counts of aggravated assault, and one count of tampering with evidence. He now appeals.

**Analysis**

## I. Sufficiency of the Evidence

The Defendant first contends that the State presented evidence insufficient to convict him of second degree murder. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by

the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person "acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

The Defendant largely argues insufficiency by attacking the credibility of Ms. Armstrong and Jeremy Jones. The jury obviously accredited those witnesses' testimony, however. The Defendant also notes that "all three men [the Defendant, Garner, and Mr. Hartley] went into a darkened utility room and no witness could testify who actually stabbed [Mr. Hartley] in that location." It is true that no witness actually viewed the stabbing of Mr. Hartley. Witnesses testified, however, that the Defendant entered the utility room holding a knife and exited the utility room holding the same knife, its blade now covered in blood. The Defendant's clothes were also newly covered in blood. According to Bryan Jones, Garner did not appear to have blood on him. Under these circumstances, any rational jury could find that the Defendant stabbed Mr. Hartley and caused his subsequent death.

Any rational jury could also find that the Defendant did so knowingly. He joined Garner in attacking Mr. Hartley in the utility room, and proof indicated that he stabbed Mr. Hartley non-accidentally. The evidence of Mr. Hartley's two deep chest wounds was also sufficient to establish that the Defendant would have been aware that his conduct was reasonably certain to cause Mr. Hartley's death. This issue is without merit.

## II. Length of Sentence

The Defendant next argues that the trial court erred in sentencing him to twenty-five years in the Department of Correction for his second degree murder conviction. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of

sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

The presentence report reflects that the Defendant was a twenty-one-year-old, single white male at the time of sentencing. He dropped out of high school and reported no employment history. He has a number of prior criminal convictions, including three convictions for assault, one conviction for disorderly conduct, one conviction for resisting a stop and frisk, and a number of juvenile delinquency adjudications. He has no prior felony convictions. As a Range I, standard offender who committed a Class A felony, the Defendant faced a fifteen to twenty-five-year sentencing range. See Tenn. Code Ann. § 40-35-112(a)(1).

In levying the maximum sentence, the trial court found as enhancement factors that: (1) the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; (2) the Defendant was a leader in the commission of an offense involving two or more criminal actors; (3) the Defendant had failed to comply with the conditions of a sentence involving release into the community; (4) the Defendant possessed or employed a deadly weapon during the commission of the offense; and (5) the Defendant was being sentenced for an offense committed while on probation. See Tenn. Code Ann. § 40-35-114(1), (2), (8), (9), (13)(C). The Defendant does not contest the applicability of any of these enhancement factors, but urges that a sentence of fifteen years would "adequately fulfill the goals of the sentencing process."

Our review of the record, however, reflects that the trial court properly considered the purposes and principles of the Sentencing Act, including the seriousness of the Defendant's offense and his amenability to rehabilitation, and correctly applied the enhancement factors above. In our view, the trial court imposed a lawful sentence in accordance with our sentencing laws. Under these circumstances we will not disturb the trial court's decision. This issue is without merit.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the judgments entered by the trial court.

_____
DAVID H. WELLES, JUDGE